## IN THE UNITED STATES DISTRICT COURT
### DISTRICT OF KANSAS

| | | |
|---|---|---|
| **SRA INSURANCE AGENCY, LLC,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **VIRTUS LLC,** | ) | |
| Serve at: | ) | |
| **Corporation Service Company.** | ) | **Case No. 2:21-cv-02181** |
| **2900 SW Wanamaker Drive Suite 204** | ) | |
| **Topeka, Kansas 66614** | ) | |
| | ) | |
| **CORY FISCHBACH,** | ) | |
| Serve at: | ) | |
| **4401 E. 108th St.** | ) | |
| **Kansas City, MO 64137** | ) | |
| | ) | |
| **MATTHEW HOLT,** | ) | |
| Serve at: | ) | |
| **8008 Westgate Dr.** | ) | |
| **Lenexa, KS 66215** | ) | |
| | ) | |
| **JENNIFER HOWARD,** | ) | |
| Serve at: | ) | |
| **5006 Briar St.** | ) | |
| **Roeland Park, KS 66205** | ) | |
| | ) | |
| **LANCE LUTHER** | ) | |
| Serve at: | ) | |
| **2932 Walnut St.** | ) | |
| **Kansas City, MO 64108** | ) | |
| | ) | |
| **KARRA McGREEVY,** | ) | |
| Serve at: | ) | |
| **204 E. 110th St.** | ) | |
| **Kansas City, MO 64114 and** | ) | |
| | ) | |
| **BRIAN OTTO,** | ) | |
| Serve at: | ) | |
| **4821 W. 121st St.** | ) | |
| **Overland Park, KS 66209** | ) | |
| | ) | |
| **Defendants.** | ) | |

1

## AMENDED VERIFIED COMPLAINT
## FOR DAMAGES AND INJUNCTIVE RELIEF

Plaintiff SRA Insurance Agency, LLC ("**Plaintiff**" or "**SRA**"), by and through its undersigned counsel, hereby brings this Verified Complaint for injunctive relief and money damages against Defendants Virtus LLC ("**Virtus**") and former SRA employees Cory Fischbach, Matthew Holt, Jennifer Howard, Lance Luther, Karra McGreevy, and Brian Otto (Fischbach, Holt, Howard, Luther, McGreevy, and Otto are referred to collectively as the "**Former SRA Employees**"; the Agreements executed by the Former SRA Employees and attached hereto as Exhibits A-F are the "**Agreements**") and in support thereof, avers as follows:

### INTRODUCTION

1.      This is a corporate raiding case. Over the course of several months, Virtus, working in concert with Holt and the other Former SRA Employees, organized and executed a conspiracy to raid SRA of six strategically important employees in direct violation of written contracts and state and federal laws. Among other things, SRA has since learned that:

a.  Holt was recruiting his construction team (and others) to leave SRA since at least February 2021;

b.  Holt accessed an Excel spreadsheet detailing trade secrets of each SRA account he worked on in the hours leading up to his resignation;

c.  At the end of his employment, Holt deleted a large quantity of emails, including his Prospects folder, and then emptied the recycle bin so that SRA would not have access to these important messages;

d. Holt also accessed key SRA documents regarding clients serviced by Midwest Builders Casualty Group ("**Midwest Builders**"), a key workers' compensation insurance provider for SRA's construction clients, and then (along with Howard and Luther) went with Midwest Builders' CEO to a Kansas City Royals game two days before his resignation;

e. At least one member of Holt's team moved trade secret spreadsheets to his personal email account in the days before resigning;

f. Holt signed an employment agreement with Virtus that has: (i) restrictive covenants that are broader than those in his SRA Agreement; and (ii) a commissions structure that both encourages him to move business to Virtus and anticipates litigation;

g. Holt rapidly reached out to his biggest SRA client after moving to Virtus;

h. Holt, through Virtus, continues to solicit SRA employees to leave SRA; and

i. Numerous statements by Holt and Virtus CEO Andrew Gray reflect that they intend to move the clients serviced by the Former SRA Employees to Virtus. Indeed, given the substantial raises that Virtus has provided to Holt (and presumably the rest of his team), the only way that this new economic arrangement makes sense is if Defendants steal SRA's clients in conjunction with its employees.

2. On April 16, 2021, Matt Holt walked into SRA Financial Service Manager Sue Courtney's office and announced that he was about to resign from SRA. He revealed to Courtney that his plan was to take his book of business. He also told her that there would be several other employees leaving with him. When Courtney responded that these actions would likely get Holt and his new employer sued, Holt responded by bragging that his new employer had planned on it and had already set aside $1,000,000 to defend against the inevitable litigation.

3.      Although that sounds bad, the reality of what has happened in the few days since is worse.  Holt held true to his word that he wouldn't be the only one to resign from SRA.  That same day, five other SRA employees resigned as part of an orchestrated scheme designed to bring new construction and manufacturing insurance expertise to Virtus at a fraction of the cost Virtus believes it would take to acquire those employees and client relationships in the open market.

4.      Virtus' plan, supported by Holt's admission regarding its litigation reserve, is to try to cripple SRA's ability to maintain its accounts that were produced and/or serviced by the Former SRA Employees, thereby backing SRA into a corner and forcing a book sale at a fraction of the genuine value of the business.  Indeed, mere hours after the six Former SRA Employees resigned, Virtus' CEO sent SRA a memorandum (the "**Memo,**" attached as Exhibit G), "in light of recent events," that read more like a ransom note – sell us SRA's accounts associated with Holt or we will steal it.

5.      While Virtus' note purports to assure SRA that each of the Former SRA Employees would abide by their respective non-disclosure and non-solicitation obligations, the opposite has occurred. In the two business days since the Former SRA Employees resignations, it has become apparent that the Former SRA Employees have accessed and stolen various SRA confidential and proprietary information, solicited several other SRA employees to join them at Virtus, and, not surprisingly, solicited SRA clients associated with Holt. Their conduct, which not only breaches their commitments in the Agreements but also state and federal law, must be stopped.

## PERTINENT BACKGROUND FACTS

6.      Prior to hiring the Former SRA Employees, Virtus did not have a group specializing in providing insurance products and services to construction clients.  As stated by Virtus CEO Andrew Gray in a March 2021 interview (*see* Exhibit H), Virtus' plan is to grow rapidly and

substantially. However, "[b]ecause the valuations of [other insurance] businesses are so high right now driven by all the acquisition activity, we've made a practice to go source the best talent and bring them onto our platform."  In the article, Gray continued by saying Virtus is focused on recruiting teams in the specialty space, such as construction. In other words, Virtus made the decision that it is cheaper to steal specialty-focused teams with built-in business and engage in unfair competition than to pay for it.

7.     Virtus began to put its grow-fast-but-cheaply strategy into action right away, focusing in on one of its employee's spouses – Holt. Virtus knew, via Morgan Holt (a Virtus Client Account Specialist and Holt's wife), that Holt was leading the Kansas City construction vertical for SRA and had a healthy book of business. They also knew that Holt had a team of other producers and account executives that specialized in the construction and manufacturing segment that already had the expertise and relationships needed to service SRA's accounts.

8.     Based on this inside knowledge, Virtus developed a plan to recruit SRA's construction team and then take the business serviced by the Former SRA Employees, counting on the fact that abruptly cleaning out SRA's construction group would destabilize SRA and impair its ability to retain its clients.

9.     To execute, Virtus starting recruiting Holt as early as January 2021. By late February, Holt had bought in to Virtus' vision and held a five-hour long meeting to solicit his SRA colleagues to join him in his new endeavor.

10.     During that meeting, Holt's wife emailed him multiple times asking for updates for when he would be home.  (Email exchange attached as Exhibit I.)  Holt responded with:

> **From:** Matt Holt
> <Matt.Holt@assuredpartners.com>
> **Sent:** Friday, February 26, 2021 6:09 PM
> **To:** Morgan Holt <mholt@virtusins.com>
> **Subject:** Re: phone not working
>
> Sorry a little bit. We are having serious
> conversations now with my team, not Andrew.
> I can leave if you want but I'd lie if I said this
> wasn't important. Just let me know love. I can
> head home if you need me.

When Holt's wife followed up, Holt replied

> **From:** Matt Holt <Matt.Holt@assuredpartners.com>
> **Sent:** Friday, February 26, 2021 6:31 PM
> **To:** Morgan Holt <mholt@virtusins.com>
> **Subject:** Re: phone not working
>
> I have so much anxiety love. I should do this.
>
> Sent from my iPhone

Holt finally ended the meeting and headed home close to 9 p.m.

11.     But Holt did not stop at his own team when trying to solicit additional employees to leave SRA for Virtus. In March, Holt talked with SRA Team Lead Denise Kordes. Not even a week later, Mr. Kordes received a call from Virtus CEO Andrew Gray soliciting her to join Virtus. Despite Ms. Kordes telling Gray she was not interested at this time, Gray called her again to solicit her employment the following week. Ms. Kordes again refused his offer.

12.     Holt also spent March and April accessing and likely taking a compilation of SRA's confidential and proprietary information. For example, the day before he left, Holt was accessing an Excel spreadsheet called "My Production." The spreadsheet, for which he had no business purpose to access mere hours before his planned departure, contains highly confidential client

information for SRA clients dating back to 2015, including client names, renewal dates, types of policies written and premium information. This is the exact type of document Holt would rely on in working to move SRA clients to Virtus.

13.     Moreover, a review of Otto's emails revealed that, on April 1, 2021, Otto sent his personal email a digest outlining a compilation of highly confidential client information, including data outlining all of the client's coverage lines, policy terms, policy numbers, carriers, limits, exposures, names insureds, sales, payroll information, and different schedules with detailed information needed to include different automobiles, equipment, and drivers on its policies.

14.     In the days leading up to their planned April 16 resignations, Holt and the other Former SRA Employees finished preparing for their departures from SRA. Holt finally received his written employment documents from Virtus, naming him "President and St. Louis Market Leader" and guaranteeing him a $300,000 base salary for three years, plus commissions.

15.     Notably, his Virtus employment documents agrees to pay Holt commissions on "Acquired Revenue," as that term is defined in Holt's Producer Employment Agreement. Virtus defined "Acquired Revenue" to include any revenue for which Virtus "…purchased such revenue from any third party (whether via a "negotiated purchase **or as part of a litigation settlement** on behalf of or for the benefit of [Holt]" [emphasis added]). Upon information and belief, Virtus has also agreed to indemnify Holt and/or otherwise cover Holt's expenses as part of any litigation brought to enforce Hold's agreement with SRA.

16.     Once officially signed up with Virtus, and two days *before* resigning from SRA, the Former SRA Employees got to work on the insurance carrier relationships they would need in order to write highly-specialized construction business at Virtus.  Holt (along with Howard and Luther) took John Crowley, the CEO of Midwest Builders, to lunch and a Kansas City Royals

baseball game.  Midwest Builders is an important carrier for SRA's construction clients and Holt touts himself as Midwest Builders' largest producer, writing more business through them than anyone else.  But Virtus is not currently appointed by Midwest Builders to write its policies.

17.     Because Midwest Builders is one of the key insurers that SRA uses to service its construction clients, and Virtus intends to steal those clients, Holt almost certainly used this social engagement to let Crowley know of the impending move so that Midwest Builders would be able to write insurance for clients serviced by the Former SRA Employees in anticipation of their move to Virtus.

18.     Once the preparations were complete, the Former SRA Employees resigned en masse, without notice, and with immediate effect on Friday, April 16, 2021.  By doing so, they maximized the potential disruption to SRA's business in the hopes that the instability would push clients to Virtus.  As part of this calculated scheme, Gray then sent a thinly veiled threat to SRA mere hours after the mass resignations, self-servingly claiming that Virtus planned to have the Former SRA Employees comply with their contractual obligations.

19.     Despite these empty assurances, Virtus and the Former SRA Employees have only continued to flout their obligations.  For example, in the two business days since Holt's departure, SRA has learned that Virtus reached out to solicit Michael Rodriguez, SRA's Commercial Lines Manager, to leave SRA for Virtus.

20.     SRA also learned that Holt has widened his solicitation efforts to include SRA clients.  Specifically, on April 19, 2021, upon contacting one of the largest accounts Holt worked on, WestPro, SRA was advised that they already knew Holt had left, that they had talked with him, and that they did not need SRA for anything at this time.

21.    Although SRA's forensic analysis of the Former SRA Employee's computers is not complete, SRA cannot wait any longer before seeking immediate relief from this Court. Indeed, Virtus and the Former SRA Employees have made it abundantly clear that they are only getting started, and that nothing short of an immediate Order from this Court will stop them.

## PARTIES AND JURISDICTION

22.    SRA is a Kansas limited liability company with its principal place of business in Lake Mary, Florida.

23.    SRA is 100% owned by Assured Partners Capital, Inc., a Delaware corporation with its principal place of business in Lake Mary, Florida.

24.    Virtus is a Kansas limited liability company with its principal place of business at 4550 W. 109th Street Suite 301, Overland Park, Kanas 66211.  Virtus can be served at its registered agent: Corporation Service Company, located at 2900 SW Wanamaker Drive, Suite 204, Topeka, Kansas 66614.

25.    Virtus is 100% owned by Virtus Holdings, LLC.  Upon information and belief, the owners of Virtus Holdings, LLC are not domiciled in Delaware or Florida.

26.    Fischbach is an individual who, upon information and belief, is a resident of Missouri living at 4401 E. 108th St., Kansas City, Missouri 64137.

27.    Holt is an individual who, upon information and belief, is a resident of Kansas living at 8008 Westgate Drive, Lenexa, Kansas 66215.

28.    Howard is an individual who, upon information and belief, is a resident of Kansas living at 5006 Briar Street, Roeland Park, Kansas 66205.

29.    Luther is an individual who, upon information and belief, is a resident of Missouri living at 2932 Walnut Street, Kansas City, Missouri 64108.

30.     McGreevy is an individual who, upon information and belief, is a resident of Missouri living at 204 E. 110th Street, Kansas City, Missouri 64114.

31.     Otto is an individual who, upon information and belief, is a resident of Kansas living at 4821 W. 121st Street, Overland Park, Kansas 66209.

32.     Personal jurisdiction is proper in this Court because Virtus has its principal place of business in Kansas; because each of the Former SRA Employees is employed by Virtus; because three of the six Former SRA Employees are residents of Kansas, and because Defendants engaged in unlawful conduct in Kansas which has caused harm to SRA.

33.     The Court has subject matter jurisdiction over SRA's federal claims under 28 U.S.C. § 1331 and supplemental jurisdiction over SRA's state law causes of action under 28 U.S.C. § 1367.

34.     This court also has jurisdiction over this action under 28 U.S.C. § 1332 because the parties are diverse and the amount in controversy is more than $75,000.

35.     Venue is proper in this Court because Defendants regularly conduct substantial business activities in Kansas and because SRA's various causes of action arose, in whole or in part, in Kansas.

## GENERAL ALLEGATIONS COMMON TO ALL COUNTS

### I.   Background and Business of SRA

36.     SRA is among a family of insurance brokerages owned by Assured Partners Capital, Inc. and its related companies (collectively, the "**Assured Group**"). The Assured Group is a national brokerage firm founded in 2011 as a national partnership of leading independent property, casualty, and employee benefits brokerages firms. The Assured Group provides

insurance services to individuals and businesses in numerous industries, such as aerospace, agriculture, construction, financial services, manufacturing, and real estate, among many others.

37.     Since 2011, the Assured Group has invested heavily in high growth strategies through its successful model of partnering regional insurance brokerages with the resources of a nation-wide family of brokerages, enabling cross-marketing revenue generation and expanding market share through the combined experience and know-how for marketing and business development through hiring, retention, and training of insurance producers who drive revenue. Doing so has enabled the Assured Group family of local and regional insurance brokerages to continue to capture market share across numerous lines of insurance products and services throughout the nation.

38.     One such member of the Assured Group is SRA.  SRA was originally founded in 1980 as Schifman Remley & Associates.  It joined the Assured Group in 2012 and does business under the AssuredPartners brand.  SRA operates throughout the Kansas City area.

39.     As an insurance brokerage, SRA relies upon and invests heavily in the success of its individual insurance producers.  These producers leverage their experience, expertise and the Assured Group's national resources to generate new business, whether through relationships with new clients or through sales of new lines to existing clients.  Repeat business through insurance renewals from existing clients are of paramount importance to the success and growth of SRA. SRA invests in its producers to ensure they continue to nurture and develop the SRA book of business assigned to and/or generated by an individual producer.

II.     **SRA's Trade Secrets**

40.     Equally critical to SRA's success, however, is its investment into the development and safeguarding of the confidential and trade secret information central to the business platform.

Through careful and consistent enforcement of lawful confidentiality policies and contractual obligations and implementing other physical and electronic security measures, SRA protects its prized assets – the trade secret and confidential information acquired and developed through continued investment.

41.    SRA devotes substantial resources to the protection of information critical to the success of the business where the value of such information depends on it being maintained as confidential and used only for the benefit of SRA. As alleged herein, SRA treats such information as its trade secrets (hereinafter referred to as "**Trade Secrets**" or "**SRA Trade Secrets**"):

a.    All information concerning SRA clients, prospective clients, acquisition targets, vendors, insurance carriers, policy forms, rating information, expiration dates, and/or contracts or arrangements;

b.    SRA's financial condition, results of operations, marketing plans, business plans, operations, pricing, promotions, and business strategies and methods;

c.    SRA's services and products offered by SRA to its clients or prospective clients, including, but not limited to, policy forms, rating information, expiration dates, information on risk characteristics, and information concerning insurance markets for large or unusual risks; and

d.    Personal identifying information, job history, qualifications, training, specialties, strengths, weaknesses, evaluations, client contacts, contractual obligations, pay data, salary and commission information, job responsibilities, account responsibilities, customer satisfaction, employee turnover or retention, or other business-related information of SRA employees.

42.     SRA developed, compiled, and acquired its Trade Secrets at great expense and through substantial efforts. SRA's Trade Secrets are not readily ascertainable in the insurance industry or in any type of trade or public directory or any other source.

43.     The misuse of SRA Trade Secrets, whether through the improper disclosure or improper use for a non-SRA business purpose, would cause significant damage to SRA through potential loss of business and business opportunity, loss of goodwill, loss of employees through unfair and unlawful means, damage to reputation, and other types of harm.

44.     As such, SRA takes careful, deliberative actions at great expense to protect against the misuse or wrongful disclosure of SRA Trade Secrets.  SRA has taken steps reasonable under the circumstances to maintain the secrecy of its Trade Secrets, such as: (a) emphasizing to employees SRA's need to keep this information a secret; (b) requiring, as a condition of employment that all employees promise not to use or disclose this information except in the performance of their duties for SRA; (c) having employees execute confidentiality and non-disclosure agreements that instruct SRA's employees not to disclose, reproduce or use this information without SRA's consent; (d) distributing confidentiality policies to all employees through company handbooks the receipt for which must be acknowledged by the employee; (e) limiting access and/or restricting access to this information by employees on a need-to-know basis; (f) requiring unique usernames and passwords to access Trade Secrets on SRA's computer systems and databases; and (g) implementing a number of physical and electronic security measures, including restricting access to databases and network space, assigning passwords and user-level permissions to access information on SRA's computer system, servers, and networks, encrypting SRA laptops issued to employees, and requiring that Trade Secrets be kept in secure locations when not in use.

45.    For example, the employee handbook used by SRA in 2021 obligates all SRA employees to acknowledge, and be bound by, provisions identifying in detail the nature of SRA Trade Secrets and obligating employees to protect such information. SRA's Handbook states in pertinent part:

> AssuredPartners takes the confidentiality of its Trade Secret and Confidential Information very seriously. All AssuredPartners employees are prohibited from using any such Trade Secret or Confidential Information for his/her personal benefit or for the benefit of any person or entity other than AssuredPartners. Employees may not remove, copy, replicate, disseminate, forward (*e.g.*, forward AssuredPartners' emails to an employee's private email account) Trade Secret or Confidential Information, or partner, coordinate or cooperate with third parties to do the same. Further, AssuredPartners restricts access to such Trade Secret and Confidential Information only to those who have a need to know it for AssuredPartners' business purposes.

46.    Further, as part of SRA's efforts to protect its Trade Secrets, SRA does not allow insurance producers access to SRA Trade Secrets until after the producer executes a written confidentiality agreement whereby producers acknowledge they will have access to SRA Trade Secrets, promise not to disclose SRA Trade Secrets to anyone not authorized to receive it, and to confirm they will not use SRA Trade Secrets except for legitimate business purposes for the benefit of SRA.  Producers also agree that confidentiality obligations survive the termination of their employment relationship with SRA, that they will continue to treat SRA's Trade Secrets as confidential, that they will not disclose SRA's Trade Secrets to any third party, and that they will not retain SRA Trade Secrets.

47.    SRA also guards the confidentiality of its Trade Secrets by enforcing its contracts protecting its Trade Secrets.  SRA does not tolerate violations of confidentiality provisions and takes steps to enforce its rights, from cease and desist letters to litigation seeking emergency or preliminary and permanent injunctive relief, when, for example, producers violate their employment and post-employment confidentiality obligations.

48.     Because of the nature of the Trade Secrets, SRA's commitment to enforce its confidentiality agreements, the fact that the Trade Secrets derive value by virtue of being confidential, and the fact that the Trade Secrets cannot be obtained from public sources by competitors, SRA's Trade Secrets are trade secrets under federal law.

49.     In the course and scope of their duties as insurance producers for SRA, the Former SRA Employees had access to, regularly used, and were responsible for maintaining and safeguarding SRA Trade Secrets from use and disclosure for a competitive purpose.

III.     **SRA Confidential Information**

50.     Further, to the extent SRA Trade Secrets are not considered trade secrets under federal law, such information is protected as confidential information under the Agreements (hereinafter referred to as "**Confidential Information**" or "**Assured Confidential Information**").

51.     SRA Confidential Information encompasses all information belonging to SRA other than Trade Secrets (as defined above) that is proprietary and confidential in nature, whether the information is reduced to writing or in a form from which such information can be obtained, translated or derived into reasonably usable form, and whether the information is simply in an employee's head, that: (a) has been provided to the employee during his/her employment with SRA; (b) the employee has gained access to while employed by SRA; and/or (c) was developed by the employee in the course of his/her employment with SRA.

52.     Examples of SRA Confidential Information include, but are not limited to:

    a.  information believed by SRA to be a trade secret (as defined above) that ultimately does not qualify as a trade secret under applicable law but nonetheless was maintained by SRA as confidential;

b.  the non-trade secret but still proprietary or confidential methodologies, strategies, programs, and systems used by SRA in managing assets, liabilities, and risk and/or in soliciting, marketing, selling and providing services to its clients;

c.  private and confidential communications with SRA's clients, vendors, insurance carriers, and consultants;

d.  non-trade secret but still confidential or private information of third parties that SRA has contractual and/or legal obligations to maintain as confidential, including all client information that SRA and its employees are restricted from disclosing by federal, state or local statutes or regulations;

e.  non-trade secret but still proprietary or confidential financial and accounting information of SRA;

f.  non-trade secret but still proprietary or confidential information concerning SRA's current and prospective clients and vendors (including, but not limited to, information that clients and vendors expect SRA to keep as confidential);

g.  non-trade secret but still proprietary or confidential information concerning SRA's consultants, independent contractors, and vendors (including lists of all the foregoing); and

h.  personnel files and employment-related records of SRA's current and former employees (including, but not limited to, information related to the hiring, recruitment, retention, and termination of its current and former employees, as well as information related to their job duties, assignments, skills, training, performance, discipline, promotions, compensation, benefits, leaves of absence, and medical files).

53.     As with its Trade Secrets, SRA takes the same reasonable measures to protect against the misuse and wrongful disclosure of SRA Confidential Information.  These measures include, but are not limited to: (a) emphasizing to employees SRA's need to keep this information confidential; (b) requiring, as a condition of employment that all employees promise not to use or disclose this information except in the performance of their duties for SRA; (c) having employees execute confidentiality and non-disclosure agreements that instruct SRA's employees not to disclose, reproduce or use this information without SRA's consent; (d) distributing confidentiality policies to all employees through company handbooks the receipt for which must be "acknowledged" by the employee; (e) limiting access and/or restricting access to this information by employees on a need-to-know basis; (f) requiring unique usernames and passwords to access Confidential Information on SRA's computer systems and databases; and (g) implementing a number of physical and electronic security measures, including restricting access to databases and network space, assigning passwords and user-level permissions to access information on SRA's computer system, servers, and networks, encrypting SRA laptops issued to employees, and requiring that Confidential Information be kept in secure locations when not in use.

54.     In the course and scope of their duties as insurance producers for SRA, the Former SRA Employees had access to, regularly used, and were responsible for maintaining and safeguarding SRA's Confidential Information from use and disclosure for a competitive purpose.

IV.     **The Former SRA Employees and their Agreements**

55.     Holt joined SRA on July 15, 2015.

56.     For the entirety of his employment, Holt worked as a Producer in SRA's construction group.

57.    Holt was an integral part of the construction group at SRA.  He worked with  the employees within the group (consisting primary of the remaining Former SRA Employees) and helped maintain its relations with clients and carriers.

58.    Construction clients require constant attention and care from their insurance providers because the nature of the business is such that the clients frequently add new equipment, new drivers, or have other changes that require modifications to their insurance coverage.  As a result, Holt and his team had substantial client contact on behalf of SRA and gained a substantial amount of confidential information about their clients' businesses.

59.    As a Producer, Holt solicited and sold insurance products and services to existing and new commercial clients, mainly in the construction space.  Holt was in charge of maintaining a substantial book of business.

60.    Holt's duties for SRA included: (a) the use of sales techniques to identify prospects; (b) engaging in frequent communications with client to build relationships and address those clients insurance needs; (c) working with account executives to develop renewal and marketing strategies; and (d) developing relationships with carriers by becoming familiar with and executing strategies developed for satisfying carrier goals and objectives, and participating in carrier sponsored activities.

61.    As a condition of the commencement of his employment, Holt executed the Employment and Restrictive Covenants Agreement on July 15, 2015.  A true and accurate copy of the Employment and Restrictive Covenants Agreement is attached hereto as **Exhibit A**.

62.    Holt committed in his Agreement that he would not use, disclose, or retain SRA's Confidential Information:

3.  *Confidential Information.*

3.1.  For purposes of this Agreement, the term "Confidential Information" means all confidential, proprietary and/or non-public information, whether or not in a written or recorded form, concerning the business or affairs of the Company, including but not limited to, information concerning:

3.1.1. the Company's clients, prospective clients, acquisition targets, vendors, insurance carriers, policy forms, rating information, expiration dates, and/or contracts or arrangements (including special terms and deals);

3.1.2. the Company's financial condition, results of operations, marketing plans, business plans, operations, pricing, promotions, and business strategies and methods; and

3.1.3. the services and products offered by the Company to its clients or prospective clients, including, but not limited to, policy forms, rating information, expiration dates, information on risk characteristics, and information concerning insurance markets for large or unusual risks.

3.2.  Employee acknowledges and agrees that all Confidential Information is the sole and exclusive property of the Company. Accordingly, both during and after employment with the Company (whether such separation from employment is voluntary or involuntary, or with or without cause), Employee shall not use, or disclose to any third party, any

Confidential Information for any reason other than as intended within the scope of Employee's employment or as approved by an executive officer of the Company in writing. Upon separation of employment for any reason, or at any other time upon request of the Company, Employee shall immediately deliver to the Company all documents, materials, and data (and copies thereof), in tangible, electronic, or intangible form, relating to the business of the Company.

Exhibit A, Paragraph 3.

63.   Holt also promised that he would not solicit or service certain SRA customers after the end of his employment and likewise that he would not solicit or hire its employees:

4.  *Non-Solicitation & Non-Interference.*

    4.1.  Except on behalf of the Company, during Employee's employment with the Company and for twenty-four (24) months after Employee's employment ends with the Company (whether voluntary or involuntary or with or without cause), Employee shall not directly or indirectly through another person or entity:

        4.1.1. offer, sell, solicit, quote, place, provide, renew or service any insurance product or service to, or on behalf of, any Restricted Client;

        4.1.2. take any action intended, or reasonably likely, to cause any vendor, insurance carrier, wholesale broker, Restricted Client, other client of the Company, or any other third party with a material business relationship with the Company to cease or refrain from doing business with the Company; or

        4.1.3. solicit, hire, engage or seek to induce any of the Company's employees to terminate such employee's employment with the Company for any reason, including, without limitation, to work for Employee or a competitor of the Company.

    4.2.  *Restricted Clients.*  For purposes of this Agreement, "Restricted Client" means the following:

        4.2.1. any client of the Company at the office where Employee was employed during the two (2) years immediately preceding the date on which Employee's employment with the Company ended for any reason, whether voluntary or involuntary or with or without cause (the "Separation Date");

        4.2.2. any client of the Company during the two (2) years immediately preceding the Separation Date as to which the Employee either had some involvement in proposing, selling, quoting, placing, providing, servicing or renewing any insurance product or service or about whom the Employee received Confidential Information; or

        4.2.3. any prospective client of the Company within two (2) years immediately preceding the Separation Date as to which Employee had involvement in proposing, selling, quoting, placing, providing, servicing, or renewing any insurance product or service or about whom Employee received Confidential Information.

Exhibit A, Paragraph 4.

    64.    Holt acknowledged that SRA would be entitled to injunctive relief in the event that he violated any of the terms of his Agreement and that the duration of the restrictive covenants would be extended for the period of a violation:

4.3.  *Enforcement.*  In the event of the breach or a threatened breach by Employee of any of the obligations of **Section 4.1** above, the Company, in addition to other rights and remedies existing in its favor, shall be entitled to injunctive relief and may apply to any court for specific performance, temporary, preliminary, and/or permanent injunctive relief, or other relief in order to enforce the obligations or prevent any violations of the obligations. In addition, in the event of an alleged breach or violation by Employee of the obligations in **Section 4.1**, the Restricted Period shall be tolled until such breach or violation has been cured.

*Id.*

65.     In Paragraph 15.1 of the Employment and Restrictive Covenants Agreement, Holt

agreed that the contract would be governed by Florida law.

66.     Finally, in Paragraph 19 of the Employment and Restrictive Covenant Agreement,

Holt committed that in the event that he breached the contract, then SRA would be entitled to

recover its attorneys' fees:

> 19.   *Attorneys' Fees.* If the Company engages one or more attorneys to enforce any of the terms of this Agreement or otherwise protect the Company against any breach or threatened breach of this Agreement, whether or not a lawsuit or claim is actually filed, Employee shall be responsible for all of the Company's actual attorneys' fees, costs and expenses, and all other reasonable costs and expenses, in addition to any other legal or equitable relief to which the Company may be entitled.

67.     When Holt joined SRA as a producer, McGreevy had already been working for

Plaintiff for three years.

68.     For the entirety of her employment, McGreevy worked as an Account Executive in

SRA's surety bond department.  Her primary job duties were to process and place surety bonds for

SRA's construction clients.  McGreevy was an integral part of Holt's team because of her skills

and knowledge regarding surety bonds.

69.     In Holt's first two years of employment, SRA hired a trio of Account Executives to

work on Holt's construction team, all of whom Holt had a pre-SRA relationship with: Luther on

January 4, 2016, Fischbach on July 22, 2016, and Otto on April 27, 2017.

70.     As Account Executives, Luther, Fischbach, and Otto provided sales support to Holt.

In conjunction with other SRA personnel, Luther, Fischbach, and Otto engaged in sales, marketing,

and customer service functions for SRA.  Their role required regular contact with clients, as well

as work designing insurance plans and providing detailed analysis to clients, as well as writing complex commercial insurance programs.

71.    Luther, Fischbach, and Otto also worked closely with insurance carriers, building relationships with their personnel and understanding the carriers' goals and objectives.

72.    Luther, Fischbach, and Otto each were responsible for a book of business that in some cases could be substantial.

73.    SRA also added Howard to Holt's construction team as a second Producer on September 11, 2019.  Howard did not have experience in the insurance industry before she joined.

74.    Howard's job duties were similar to those of Holt, although she did not manage the construction group.

75.    As a condition of the commencement of their employment with SRA, McGreevy, Luther, Fischbach, Otto, and Howard all executed documents titled "Restrictive Covenants Agreement" or "Employment and Restrictive Covenants Agreement."   The terms of those Agreements are similar to those of Holt's and are attached hereto as Exhibits B-F.[1]

## V.    **Background of Virtus**

76.    Virtus was founded in 2013.   Virtus is backed by Agman, a multi-strategy investment firm based in Chicago and Omaha that is owned by the Silverman family.

77.    According to its CEO Andrew Gray, it was created to focus on "certain industries and product lines."  As of March 2021, those niche markets were multifamily real estate, private

---

[1]    The non-solicitation and non-disclosure provisions in Otto and Howard's Agreements are slightly different but also prohibit them from soliciting or servicing business directly or indirectly from the same substantive set of SRA clients, as well as from using, disclosing, or retaining key, non-public SRA information. *See* Otto and Howard Agreements, ¶¶ 2-3.  Holt's, Fischbach's, Luther's, McGreevy's and Otto's Agreements include Florida choice-of-law provisions, whereas Howard's has a Missouri choice-of-law provision. *See* Holt, Fischbach, Luther, and McGreevy Agreements, ¶15.1; Otto and Howard Agreements, ¶16.

capital, food industries, staffing firms, hospitality, manufacturing and distribution, health care, and transportation.

78.     Virtus did not include construction as one of its specialties as of March 2021. Recently, though, it has created a construction section on its web site containing Virtus' Managing Partner, its Claims Director, an Account Manager (with a blank bio), an Account Executive (also with a blank bio), and a Risk Control Director.  None of the five listed employees appear to have specific expertise in the construction area.

79.     Gray has also stated that Virtus wants to become one of the top 100 insurance brokerages by the end of 2022, which would entail substantial expansion, but that it would be difficult to expand by merger or acquisition because acquisition prices in the insurance industry are "so high" at present.

80.     As stated by Virtus CEO Andrew Gray in a March 2021 interview (*see* Exhibit H), "[b]ecause the valuations of [other insurance] businesses are so high right now driven by all the acquisition activity, we've made a practice to go source the best talent and bring them onto our platform."  In the article, Gray continued by saying Virtus is focused on recruiting teams in the specialty space, such as construction.

81.     Upon information and belief, Virtus did not have a focus on the construction industry or employees who specialize in servicing construction clients prior to hiring the Former SRA Employees.

82.     Virtus is a direct competitor of SRA and specifically intends to pilfer SRA's construction clients by recruiting away almost the entire team that serviced those clients, leaving SRA unable to service the clients.

**VI.** **Holt and the Other Former SRA Employees Violate their Agreements and Move to Virtus**

83. Upon information and belief, Holt began planning to move himself and the rest of his team to Virtus months before they announced their departures on April 16, 2021.

84. For instance, Holt was communicating with Virtus Managing Partner John Eichmann by January 27, 2021.

85. Holt's wife Morgan works for Virtus as a Client Account Specialist. On information and belief, Holt and his wife shared confidential information about their employers as a matter of course. In fact, Holt made comments to Preston Elder (an SRA Consultant specializing in employee benefits and risk management) that he would forward SRA's Producer Scoreboard to his wife. The "Scoreboard" lists new business production at SRA and would therefore be highly valuable to a competitor.

86. On February 26, 2021, Morgan Holt emailed her husband to say that her "phone turned off and won't turn back on." (Exhibit I.) During that email exchange, Holt told his wife that "we are having serious conversations now with my team, not Andrew. I can leave if you want but I'd lie if I said this wasn't important." On information and belief, Holt was referring to Virtus CEO Andrew Gray. Holt then stated that "I have so much anxiety love. I should do this." Based on the email exchange, it appears that Holt's meeting with his team lasted for roughly five hours.

87. Upon information and belief, Holt was meeting with the other Former SRA Employees on February 26, 2021 to discuss a potential departure to Virtus.

88. Also on information and belief, Holt then communicated with Virtus regarding the hiring of the other Former SRA Employees.

89. In March 2021, Matt Holt also talked with Denise Kordes, a Team Leader with SRA. With a week of that conversation, Kordes started receiving calls from Gray, who was trying

to recruit her to join Virtus.  Kordes later learned that the entire construction group was leaving to go to Virtus.

90.    Upon information and belief, Holt told Gray about his conversation with Kordes and thereby caused Gray to start soliciting Kordes to leave SRA and join Virtus.

91.    In the aftermath of the February 26 meeting, Otto sent a number of attachments containing highly confidential information to his personal email account: bojayhawk@yahoo.com.

92.    On March 1, 2021, Otto sent to his personal account a spreadsheet containing the July 2021 expiration report for five SRA clients, which includes the clients' names, their policy expiration dates, the premiums, and various other categories of information regarding the policies.

93.    On April 1, 2021, Otto sent to his personal account a spreadsheet containing a five-year deductible analysis for client Newcomer, as well as an eight-tab spreadsheet contains numerous categories of confidential information regarding Palmentere Brothers Distributing / PR&G, Inc., including details regarding their insurance policies, their projected gross sales, their payrolls, and lists of their vehicles, drivers, and equipment.

94.    The information that Otto sent to his personal email account is not publicly available and would be valuable for any competitor seeking to procure the business of the clients listed in the spreadsheets.

95.    On March 29, 2021, Holt accessed his "Prospects" list at 6:25 p.m. and then "Agency Book of Business" at 8:52 p.m.  The former is the complete list of the prospects on which Holt was working and includes over 1,000 potential clients; the latter listed all the clients that SRA has placed with Midwest Builders, including their names, renewal dates, and policy information. Holt did so at a time when he was deep into preparations to move himself and his team to Virtus.

96.     As with the files that Otto sent to his personal email account, the information in the "Prospects" and "Agency Book of Business" spreadsheets is not publicly available and would be valuable for any competitor seeking to procure the business of the clients listed in the spreadsheets.

97.     On April 14, 2021 (two days before the mass resignation), Holt, Howard, and Luther went with Crowley, the CEO of Midwest Builders, to lunch at the Yard House and then to an afternoon Royals game.  Midwest Builders is one of the key insurers that SRA uses to service its construction clients.  Upon information and belief, Holt, Howard, and Luther used this social engagement to let Crowley know of their impending move so that Midwest Builders would be able to write insurance for clients serviced by the Former SRA Employees as soon as they moved to Virtus.

98.     Also, on April 15, 2021, Holt accessed his "My Production" Excel document right before resigning.  That document lists all of Holt's clients and their information (renewal date, type of policy written, premium and commission info, etc.).  Given that Holt was not preparing any sort of transition plan, he had no legitimate business reason to access the document on the date of his resignation.

99.     On April 16, 2021, the Former SRA Employees resigned en masse, without notice, and effective immediately.

100.    On the date that he resigned and ceased working for SRA, Holt stopped by the office of Sue Courtney, a Financial Services Manager/Account Executive for SRA.   In that conversation, Holt stated that he was leaving SRA, that he would not be the only one, that he knew that he and the other Former SRA Employees were likely going to get sued, and that Virtus had set aside $1,000,000 to defend the lawsuit. When questioned about the SRA clients he worked on, Hold responded that they would be "going with him."

101.    Furthering the goal of making it difficult for SRA to compete with Virtus for the clients previously serviced by the Former SRA Employees, Holt emptied his Deleted folder from Outlook, making it harder for SRA to restore the emails that he had deleted.  Included in the materials that Holt deleted was the contents of his "Prospects" folder.

102.    In the immediate aftermath of the group departure, SRA learned that Virtus reached out to solicit Michael Rodriguez, SRA's Commercial Lines Manager, to leave SRA for Virtus.

103.    Shortly after the mass resignation, Gray sent the Memo to AssuredPartners President Randy Larsen.  (Exhibit G.)  In the Memo, Gray stated that Virtus was taking steps to ensure that the Former SRA Employees would not keep SRA information on their phones but did not say anything about other devices or accounts, such as Cloud-based storage accounts.

104.    Gray went on to state that while the Former SRA Employees would not solicit SRA clients, Virtus "will make every effort to have such business serviced by other employees of Virtus so as to allow the former AssuredPartners employees to comply with any restrictive covenant provisions that may apply."  *Id.*

105.    In other words, Virtus' plan is to benefit from the goodwill that SRA paid the Former SRA Employees to develop with the clients by having the Former SRA Employees direct the clients to other Virtus employees to do the day-to-day management of the clients.

106.    Gray included a "Proper Exit Conduct" document with the Memo.  The Former SRA Employees had already violated (or would shortly violate) the guidelines in numerous ways, such as:

> a.    Otto retaining various SRA Trade Secrets and Holt likely doing the same;

b.  Holt directly and indirectly soliciting and hiring SRA employees by communicating with Gray to facilitate the hiring of the other Former SRA Employees and the solicitation of Kordes and Rodriguez;

c.  Holt directly soliciting SRA clients to move their business to Virtus;

d.  The Former SRA Employees did not "give proper notice" to SRA in that they resigned without notice and effective immediately and they did not request an exit interview in advance of their last days of employment.

107.  Contrary to the goals set forth in the "Proper Exit Conduct" documents, Defendants planned the departure of the Former SRA Employees to be as abrupt as possible so that SRA would not be able to execute on any transition plan and therefore Defendants would maximize their odds to capture the business of the clients serviced by the Former SRA Employees.

108.  On April 19, 2021, SRA Agency President Clint Kuechler reached out to SRA's biggest client managed by Holt, WestPro, and was told by President Gary Davenport that Holt had already informed Davenport's partner Mark Van Boren about Holt's move to Virtus.

109.  SRA understands that Holt's job title with Virtus will be President and St. Louis Market Leader (purporting working in both St. Louis and Overland Park) and that he will receive a substantial increase in compensation to work for Virtus.  (A draft of Holt's Producer Employment Agreement with Virtus is attached hereto as Exhibit J.)

110.  Holt's Producer Employment Agreement contains restrictive covenants that are more restrictive than those in the Employment and Restrictive Covenants Agreement that he executed with SRA.  (Ex. J ¶¶ 10, 12.)

111.  Holt's compensation includes commissions, which means that he has an economic incentive to move business from SRA to Virtus.  The Producer Employment Agreement

specifically includes a provision covering the treatment of revenue purchased by Virtus "from any third party (whether via a negotiated purchase or as part of a litigation settlement) on behalf of or for the benefit of Employee." (Ex. J. Schedule A ¶ 1.1.)

112.    Upon information and belief, Virtus has also agreed to indemnify Holt and/or otherwise cover Holt's expenses as part of any litigation brought to enforce Holt's agreement with SRA.

113.    Defendants' plan is to move as much SRA business as possible to Virtus, all in violation of the Agreements and using the Trade Secrets retained by Otto and Holt (and whatever additional confidential materials the Former SRA Employees have retained) and the SRA Confidential Information in their heads. Indeed, given the compensation that Virtus will be paying to Holt and the other members of his team, its recruitment strategy would only make sense if it included an assumption that the Former SRA Employees are going to move massive amounts of business from SRA to Virtus. Furthermore, by creating a commissions structure for Holt and his co-workers, Virtus has created substantial incentives for them to evade the restrictions in the Agreements.

## COUNT I
### BREACH OF CONTRACT
### (Former SRA Employees)

114.    SRA incorporates by reference its allegations set forth in paragraphs 1 through 113 of this Verified Complaint as if fully set forth herein.

115.    As a condition of the commencement of their employment with SRA, the Former SRA Employees all executed the Agreements. *See* Exhibits A-F.

116.    The Agreements are valid and enforceable contracts that prohibit the Former SRA Employees from: (a) using, disclosing, or retaining any of SRA's Confidential Information except

for the benefit of SRA; (b) soliciting or servicing certain SRA clients (whether directly or indirectly); or (c) soliciting or hiring SRA employees (whether directly or indirectly).

117.    In the Agreements, the Former SRA Employees also consented to the entry of injunctive relief in the event that they breached their contractual obligations.

118.    SRA has met all of its obligations to the Former SRA Employees under the Agreements.

119.    The Former SRA Employees have breached or plan to breach the Agreements by: (a) retaining, using, and/or disclosing SRA's Confidential Information; (b) participating in a scheme to move SRA's clients to Virtus in violation of their restrictions against soliciting or servicing certain SRA clients; and/or (c) participating in a scheme to move the SRA Former Employees and at least one other SRA employee to Virtus by directly or indirectly soliciting those employees.

120.    The Former SRA Employees' actions constitute a breach of their Agreements with SRA.

121.    As a direct and proximate result of the Former SRA Employee' actions in breach of the Agreement, SRA has sustained and/or will sustain damages and is faced with irreparable harm such that injunctive relief is appropriate.

122.    Pursuant to the terms of the Agreements, SRA is entitled to recover its attorneys' fees incurred in this action.

## COUNT II
### TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS
### (Virtus)

123.    SRA incorporates by reference its allegations set forth in paragraphs 1 through 113 of this Verified Complaint as if fully set forth herein.

124.    As a condition of the commencement of their employment with SRA, the Former SRA Employees all executed the Agreements. *See* Exhibits A-F.

125.    The Agreements are valid and enforceable contracts that prohibit the Former SRA Employees from: (a) using, disclosing, or retaining any of SRA's Confidential Information except for the benefit of SRA; (b) soliciting or servicing certain SRA clients (whether directly or indirectly); or (c) soliciting or hiring SRA employees (whether directly or indirectly).

126.    Virtus was aware of the existence of the Agreements between the Former SRA Employees and SRA, as evidenced by Gray's April 16, 2021 Memo to Larsen.

127.    By concocting and participating in a scheme with Holt and the other Former SRA Employees to move the Former SRA Employees and the clients that they serviced over to Virtus, Virtus intentionally interfered with the Agreements between the Former SRA Employees and SRA.

128.    Virtus has created substantial incentives for the Former SRA Employees to breach the terms of their Agreements.  In fact, as set forth in the Memo and as confirmed by Holt's disclosure of the existence of a $1,000,000 litigation fund, Virtus fully expects them to do so.

129.    Virtus had no justification for its intentional interference with the Agreements between SRA and the Former SRA Employees.

130.    As a direct and proximate result of the actions of Virtus, SRA has sustained and/or will suffer damages.

131.    The conduct of Virtus, as alleged in Count II, was willful and malicious and demonstrates a complete indifference to or a conscious disregard for the rights of SRA, entitling SRA to an award of punitive damages.

## COUNT III
### TEMPORARY, PRELIMINARY AND PERMANENT INJUNCTION
**(All Defendants)**

132.    SRA incorporates by reference its allegations set forth in paragraphs 1 through 113 of this Verified Complaint as if fully set forth herein.

133.    The Former SRA Employees were employees of SRA and, in their capacity as employees, had access to SRA's Trade Secrets and Confidential Information.

134.    Prior to their departure from SRA, at least one Former SRA Employee emailed to himself individual files containing SRA Trade Secrets.  Additionally, the Former SRA Employees have a wealth of SRA Confidential Information in their heads and will likely use that information to move the clients that they serviced at SRA to Virtus.

135.    Holt has violated his Employment and Restrictive Covenants Agreement by indirectly hiring the other Former SRA Employees and indirectly soliciting Kordes.

136.    Defendants have expressed an intent to violate their contractual requirements not to service certain SRA customers by directing SRA's clients to other employees of Virtus.

137.    In the absence of injunctive relief, SRA will suffer irreparable harm, including, but not limited, loss of clients, disclosure of client information to Virtus, loss of goodwill and business reputation, and unknown economic loss.

138.    SRA has no adequate remedy at law.

139.    The potential harm to SRA if Defendants are not enjoined is far greater than any harm Defendants may suffer if injunctive relief is not granted, especially since Defendants have claimed that they intend to comply with the terms of the Agreements and the Former SRA Employees agreed that SRA would be entitled to injunctive relief in the event of one or more breaches of the Agreements.

140.    SRA is likely to prevail on the merits of its cause of action against Defendants.

141.    The public interest weighs in favor of granting injunctive relief.

**COUNT IV**
**DEFEND TRADE SECRETS ACT (18 U.S.C. § 1831 *et seq.*)**
**(OTTO)**

142.    SRA incorporates by reference its allegations set forth in paragraphs 1 through 113 of this Verified Complaint as if fully set forth herein.

143.    The files emailed by Otto to his personal email account prior to his departure from SRA are trade secrets of SRA subject to protection under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. § 1831 *et seq.*

144.    The information contained in these files is valuable because it is not generally known or readily accessible, through proper means, to others who can profit from its use.  SRA has spent significant sums, in terms of both financial and human resources, to develop and maintain this information, which would be of great value to any competitor.

145.    The information contained in these files and data is related to products or services used in, or intended for use in, interstate commerce.

146.    SRA takes and, at all times relevant hereto, has taken reasonable measures to maintain the confidential and secret nature of this information. Those steps include: (a) handbook and IT policies; (b) restricting availability of certain confidential information to key employees; (c) requiring employees to execute agreements with confidentiality provisions and restrictive covenants; (d) physical security measures to protect against the disclosure of sensitive materials to third parties; and (e) IT security measures, such as password protection for all computers and segregation of certain files so that only employees with a need to access the files can do so.

147.    Otto obtained the information contained in these files and data by improper means in violation of his contractual and other obligations to SRA.

148.    Otto's foregoing conduct constitutes an actual and threatened misappropriation and misuse of SRA's trade secret information in violation of the DTSA.

149.    Upon information and belief, and as SRA expects to establish on further investigation and discovery, the Former SRA Employees improperly retained, used, and/or disclosed (and continue to retain, use, and/or disclose) to Virtus the confidential business information with which they worked when they were employed by SRA.  Specifically, SRA expects to show that Holt retained its trade secrets based on conduct that includes his March 29, 2021 access of his "Prospects" and "Agency Book of Business" spreadsheets and his April 15, 2021 access of his "My Production" spreadsheet.

150.    Otto engaged in this conduct despite acquiring this information under circumstances giving rise to a duty to maintain the information's secrecy and limit its use, which duty Otto owed and continue to owe SRA as former agents, employees and representatives of SRA.

151.    As a direct and proximate result of Otto's actual and threatened misappropriation of SRA's trade secrets, SRA has suffered irreparable harm and will continue to suffer irreparable harm that cannot be adequately remedied at law unless he is enjoined from engaging in any further acts of misappropriation and from continued possession in any form of trade secret information belonging to SRA.

152.    As a direct and proximate result of Otto's misappropriation, SRA has suffered and/or will suffer damages and irreparable harm, and is entitled to all damages, attorneys' fees, costs and remedies permitted under the DTSA.

153.     Each of the acts of misappropriation, as alleged in Count IV, was done maliciously by Otto, thereby entitling SRA to exemplary damages to be proved at trial.

### COUNT V
### MISAPPROPRIATION OF TRADE SECRETS (K.S.A. 60-3320, *ET SEQ.*)
### (Otto)

154.     SRA incorporates by reference its allegations set forth in paragraphs 1 through 113 of this Verified Complaint as if fully set forth herein.

155.     The files that Otto sent to his personal email account constitute trade secrets, pursuant to K.S.A. 60-320(4), because SRA derives independent economic value from such information not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.

156.     SRA took reasonable precautions under the circumstances to protect its trade secrets, and all parties with access to its trade secrets (including Otto) were subject to obligations to maintain their secrecy.

157.     Otto, as an employee of SRA, had access to information that consisted of SRA's trade secrets.

158.     Upon information and belief, and as SRA expects to establish on further investigation and discovery, the Former SRA Employees improperly retained, used, and/or disclosed (and continue to retain, use, and/or disclose) to Virtus the confidential business information with which they worked when they were employed by SRA.  Specifically, SRA expects to show that Holt retained its trade secrets based on conduct that includes his March 29, 2021 access of his "Prospects" and "Agency Book of Business" spreadsheets and his April 15, 2021 access of his "My Production" spreadsheet.

159.   Otto willfully and maliciously misappropriated SRA's trade secrets by, among other acts, using and disclosing SRA's trade secrets without authorization (express or implied) at a time that he knew or had reason to know that he had a duty to SRA to maintain the secrecy and confidentiality of the trade secrets contained in the files that he sent to his personal email address.

160.   As a direct and proximate result of Otto's misappropriation of SRA's trade secrets, SRA has suffered and/or will suffer damages.

161.   The actions of Otto, as alleged in Count V, were willful and malicious and demonstrate a complete indifference to or a conscious disregard for the rights of SRA.

**COUNT VI**
**BREACH OF FIDUCIARY DUTY**
**(Holt, Luther, and Howard)**

162.   SRA incorporates by reference its allegations set forth in paragraphs 1 through 113 of this Verified Complaint as if fully set forth herein.

163.   By virtue of their status as high-level employees of SRA, Holt, Howard, and Luther operated as fiduciaries with respect to SRA's business and owed SRA the fiduciary duties of loyalty and care and were required to keep the confidential and business secrets of SRA inviolate.

164.   Holt breached his fiduciary duty to SRA by engaging in misconduct that served his own self-interest and the interests of others rather than the interests of SRA and has acted in a manner inconsistent with the best interests of SRA – to wit, facilitating the movement of his entire team to Virtus, causing Virtus to solicit Kordes and Rodriguez, and generally planning to migrate the clients serviced by the Former SRA Employees to Virtus while depriving SRA of the ability to retain the business of those clients.

165.   Holt, Luther, and Howard breached their fiduciary duties going with John Crowley, the CEO of Midwest Builders, to lunch and a Kansas City Royals game two days before their

resignations, almost certainly to establish a relationship between Virtus and Midwest Builders so as to grease the transfer of business from SRA to Virtus.

166.    As a direct and proximate result of Holt's, Howard's, and Luther's breach of his fiduciary duties, SRA has incurred damages.

167.    The actions of Holt, Howard, and Luther as alleged in Count V, were willful and malicious and demonstrate a complete indifference to or a conscious disregard for the rights of SRA.

**COUNT VII**
**UNJUST ENRICHMENT**
**(All Defendants)**

168.    SRA incorporates by reference its allegations set forth in paragraphs 1 through 113 of this Verified Complaint as if fully set forth herein.

169.    As a result of their misconduct as alleged in this Verified Complaint, Defendants have been unjustly enriched or will be unjustly enriched through the use of SRA's confidential, proprietary and trade secret information by allowing them to avoid developing Virtus's own confidential and proprietary information and, upon information and belief, the solicitation, switching and converting of SRA's customers to Virtus.

170.    The retention of these benefits by Defendants under the circumstances is inequitable and, therefore, Defendants should be required to disgorge their wrongful gains.

**COUNT VIII**
**CIVIL CONSPIRACY**
**(All Defendants)**

171.    SRA incorporates by reference its allegations set forth in paragraphs 1 through 113 of this Verified Complaint as if fully set forth herein.

172.    Defendants each agreed with one another that the Former SRA Employees would

37

resign their employment with SRA in such a way as to maximize the chances that they could move the clients that they serviced on behalf of SRA to Virtus.

173.    Defendants were aware that the confidential, proprietary and trade secret information of SRA to be extremely valuable in moving SRA's business while causing harm to SRA.

174.    To that end, Defendants had a meeting of the minds with the object of accomplishing the unlawful conduct stated in this Verified Complaint.

175.    Defendants did perform one or more unlawful, overt acts in furtherance of accomplishing their objective, as set forth herein.

176.    SRA has suffered damages as a result of this conspiracy.

177.    The actions of Defendants, as alleged in Count IX, were willful and malicious and demonstrate a complete indifference to or a conscious disregard for the rights of SRA.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff SRA Insurance Agency, LLC requests that this Court provide it with injunctive relief and money damages against Defendants Virtus LLC, Cory Fischbach, Matthew Holt, Jennifer Howard, Lance Luther, Karra McGreevy, and Brian Otto in the following forms:

a.    A temporary restraining order requiring the Former SRA Employees and all those acting in concert with them to:

   (i)    return to SRA all confidential, proprietary and trade secret information belonging to SRA that is within their possession;

   (ii)    refrain (whether directly or indirectly) from offering, selling, soliciting, quoting, placing, providing, renewing, or servicing any insurance products or services to the Restricted Clients, as that term is defined in the Agreements;

   (iii)    refrain (whether directly or indirectly) from taking any action intended, or reasonably likely, to cause any vendor, insurance carrier, wholesale broker,

Restricted Client (as that term is defined in the Agreements), other client of SRA, or any other third party with a material business relationship with SRA to cease or refrain from doing business with the Company;

(iv)   refrain (whether directly or indirectly) from soliciting, hiring, engaging or seeking to induce any of SRA's employees to terminate such employee's employment with SRA for any reason, including, without limitation, to work for Virtus;

(v)   make available for inspection and imaging any computers, tablets, smartphones, external storage devices, or personal data devices on which Defendants accessed and/or retained SRA's confidential information or trade secrets as well as any and all Cloud-based file management accounts (including Gmail, iCloud, and Dropbox), email accounts, or other devices or accounts on which SRA's information could reside; and

(vi)   make available for inspection and imaging any computers, tablets, smartphones, personal data devices or email account on which Defendants contacted, attempted to contact or otherwise communicated with any SRA customer for the purpose of soliciting, developing, maintaining or servicing business in competition with SRA.

b.   A temporary restraining order requiring Virtus and all those acting in concert with it to:

(i)   return to SRA all confidential, proprietary and trade secret information belonging to SRA that is within its possession;

(ii)   refrain (whether directly or indirectly) from encouraging or participating in the Former SRA Employees offering, selling, soliciting, quoting, placing, providing, renewing, or servicing any insurance products or services to the Restricted Clients, as that term is defined in the Agreements;

(iii)   refrain (whether directly or indirectly) from encouraging or participating in the Former SRA Employees taking any action intended, or reasonably likely, to cause any vendor, insurance carrier, wholesale broker, Restricted Client (as that term is defined in the Agreements), other client of SRA, or any other third party with a material business relationship with SRA to cease or refrain from doing business with the Company;

(iv)   refrain (whether directly or indirectly) from encouraging or participating in the Former SRA Employees soliciting, hiring, engaging or seeking to induce any of SRA's employees to terminate such employee's employment with SRA for any reason, including, without limitation, to work for Virtus;

(v)   make available for inspection and imaging any computers, tablets, smartphones, external storage devices, or personal data devices on which

Defendants accessed and/or retained SRA's confidential information or trade secrets as well as any and all Cloud-based file management accounts (including Gmail, iCloud, and Dropbox), email accounts, or other devices or accounts on which SRA's information could reside;

(vi)   make available for inspection and imaging any computers, tablets, smartphones, personal data devices or email account on which Defendants contacted, attempted to contact or otherwise communicated with any SRA customer for the purpose of soliciting, developing, maintaining or servicing business in competition with SRA.

c.   A preliminary injunction, enjoining and restraining Defendants as set forth in Paragraphs (a) and (b) above pending the final determination of this action;

d.   A permanent injunction enjoining and restraining Defendants as forth in Paragraphs (a) and (b) above, subject to the time limits set forth in the Agreements;

e.   An award of actual and compensatory damages in an amount to be proven at trial;

f.   An award of exemplary and punitive damages to be proven at trial;

g.   Pre-judgment and post-judgment interest;

h.   An award of reasonable attorneys' fees and costs incurred in this action; and

i.   Such other relief as is just and proper.

## **DESIGNATION OF PLACE OF TRIAL**

Plaintiff requests a bench trial, in Kansas City, Kansas, on all counts and allegations of wrongful conduct alleged in this Amended Verified Complaint.

## **VERIFICATION**

State of Missouri            )
                             ) ss.
County of Jackson            )

      Clint Kuechler, being first duly sworn and of lawful age, states that he is the Agency President at SRA Insurance Agency, LLC, that he has read this Verified Complaint, and that he believes the allegations in the Complaint to be true and correct.

_____
Signature

     Subscribed and sworn to before me this _20_ day of April 2021.

_____
Notary Public

    My commission expires:

07.26.2022

DEEANN J DVERGSTEN
Notary Public, Notary Seal
State of Missouri
Jackson County
Commission # 18761834
My Commission Expires 07-26-2022

FP 40365676.3
FP 40368176.1

Respectfully submitted,

**FISHER & PHILLIPS, LLP**

*/s/ Melody L. Rayl*
Melody L. Rayl        Kan. No. 23730
Laura Bailey Brown    D.Kan. No. 78908
4900 Main Street, Suite 650
Kansas City, Missouri 64112
TEL: (816) 842-8770
FAX: (816) 842-8767
Email:  mrayl@fisherphillips.com
Email:  lkbrown@fisherphillips.com

and

Michael P. Elkon        Georgia No. 243355
Corey J. Goerdt         Georgia No. 437210
*Motion for Admission Pro Hac Vice Pending*
1075 Peachtree Street, NE, Suite 3500
Atlanta, Georgia 30309
Tel: (404) 231-1400
Email:  melkon@fisherphillips.com
Email:  cgoerdt@fisherphillips.com

ATTORNEYS FOR PLAINTIFF

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 20th day of April, 2021, the foregoing document was filed electronically using the Court's CM/ECF system and will be served on Defendants along with the Summons and Complaint in this matter.

A courtesy copy of the foregoing document was sent by electronic mail and overnight delivery to the following Defendants:

Virtus LLC
c/o Andrew Gray, CEO
4550 W. 109th Street , Ste. 301
Overland Park, KS 66211
Email:  agray@virtusins.com

Cory Fischbach
4401 E. 108th Street
Kansas City, MO 64137
Email: crf998@gmail.com

Matthew Holt
8008 Westgate Drive
Lenexa, KS 66215
Email: holt021@yahoo.com

Jennifer Howard
5006 Briar Street
Roeland Park, KS 66205
Email:  jlhv48@gmail.com

Lance Luther
2932 Walnut Street
Kansas City, MO 64108
Email: lancepluther@gmail.com

Karra McGreevy
204 E. 110th Street
Kansas City, MO 64114
Email:  kmcgreevy@hotmail.com

Brian Otto
4821 W. 121st Street
Overland Park, KS 66209
Email:  bojayhawk@yahoo.com

_/s/ Melody L. Rayl_____
Attorney for Plaintiff