IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| SRA INSURANCE AGENCY, LLC,<br><br>        **Plaintiff,**<br><br>v.<br><br>VIRTUS LLC, MATTHEW HOLT,<br>CORY FISCHBACH,<br>JENNIFER HOWARD,<br>LANCE LUTHER,<br>KARRA MCGREEVY, and<br>BRIAN OTTO,<br><br>        **Defendants.** | Case No. 21-2181-DDC-JPO |

**MEMORANDUM AND ORDER**

Currently before the court is plaintiff's Emergency Motion for Contempt, Order Setting Show Cause Hearing, and Order Permitting Expedited Discovery Related to Show Cause Hearing (Doc. 19). Plaintiff filed a Memorandum in Support of its Motion (Doc. 20). Defendants filed a Response in opposition (Doc. 22). And the court conducted a Show Cause Hearing on April 29, 2021. Docs. 21, 23. After the hearing, and in keeping with the court's request, the parties submitted supplemental briefing addressing, specifically, the issue of appropriate relief in this matter. Docs. 26, 27. Defendants raise a number of arguments but none are persuasive. The court thus grants plaintiff's motion in part.[1] The court explains why, below.

---

[1] The court—for now—denies some of plaintiff's requests, but only to conserve time and resources. Later in this Order, the court explains why some of plaintiff's requests are best suited for a later day.

I.    **Factual and Procedural Background**

   A.    **Factual Background**

The plaintiff in this case is SRA Insurance Agency, LLC. "SRA is among a family of insurance brokerages" that form "a national partnership of leading independent property, casualty, and employee benefits brokerages firms." Doc. 6 at 10 (Am. Compl. ¶ 36). The conglomerate to which SRA belongs "provides insurance services to individuals and businesses in numerous industries, such as aerospace, agriculture, construction, financial services, manufacturing, and real estate, among many others." *Id.* at 10–11 (Am. Compl. ¶ 36). SRA's work in the construction space is central to this dispute.

SRA names several defendants in its Amended Complaint. Virtus LLC operates a similar endeavor as SRA, but not the construction industry—or at least not yet. *Id.* at 23 (Am. Compl. ¶ 78) ("Virtus did not include construction as one of its specialties as of March 2021."). As the details of this conflict will show, Virtus allegedly would like to change that. *Id.* ("Recently, though, [Virtus] has created a construction section on its web site[.]"). SRA also has named six individual defendants: (1) Matthew Holt; (2) Cory Fishbach; (3) Jennifer Howard; (4) Lance Luther; (5) Karra McGreevy; and (6) Brian Otto (collectively, the Former SRA Employees). Each of the Former SRA Employees was on SRA's payroll, but resigned recently to join the ranks at Virtus. *Id.* at 8 (Am Compl. ¶ 18) ("Once the preparations were complete, the Former SRA Employees resigned en masse, without notice, and with immediate effect on Friday, April 16, 2021."). Defendant Holt is the only individual defendant directly implicated by the current motion.

All of the Former SRA Employees executed binding agreements with SRA when they accepted their positions at the company. *See* Docs. 6-1, 6-2, 6-3, 6-4, 6-5, 6-6 (Pl.'s Exs. A–F)

(providing signed copies of each of the Former SRA Employees' Employment Agreements with SRA). Among other promises made, the express language of the Agreements prohibits each of the Former SRA Employees from soliciting or servicing certain SRA clients for a specified duration of time, and also prohibits them from disclosing certain forms of inside information known to SRA, which the company calls "Confidential Information" and "Trade Secrets." *See id.* This background produced the current litigation and its procedural history to date.

### B. Procedural Background

Not long after the Former SRA Employees handed in their resignations, SRA filed its Complaint in this court. Doc. 1 (Compl.). Later that same day, SRA amended its Complaint. Doc. 6 (Am. Compl.). Things moved quickly from there. Also on the same day—that is, on April 20, 2021—SRA filed a Motion for Temporary Restraining Order, Preliminary Injunction, and Expedited Hearing (Doc. 7). SRA also filed a supporting Memorandum (Doc. 8). The court scheduled promptly a hearing on the matter (Doc. 12), but the hearing never convened (Doc. 13). Instead, the parties submitted a Joint Motion for Entry of a Stipulated Preliminary Injunction (Doc. 14). The court reviewed the Stipulated Preliminary Injunction, which was signed by counsel of record for all parties—including Mr. Holt (Doc. 14-1). Seeing that the parties had found a temporary fix for their disputes, the court granted the motion and entered the Stipulated Preliminary Injunction (Doc. 15).

The Stipulated Preliminary Injunction requires that defendants honor the Employment Agreements signed by each of the Former SRA Employees and return to SRA any materials which might contain Confidential Information and/or Trade Secrets. Doc. 15 at 1–3; *see also* Doc. 26 at 2–3 ("Defendants instead agreed hours before the hearing to a preliminary injunction

. . . effectively enforcing the Former SRA Employees' Agreements[.]"). This past is merely prologue for the current disputes.

Only a day later—on April 27, 2021—SRA filed the current motion (Doc. 19). According to SRA, at least one of the Former SRA Employees "wasted no time violating the Court's Stipulated [Preliminary Injunction] Order[.]" *Id.* at 1. As told through SRA's accompanying Memorandum, Mr. Holt "violated the Preliminary Injunction *twice* within 24 hours of the Court entering it, both times trying to service SRA's current clients." Doc. 20 at 1. There's more to the story—which the court saves for later sections of this Order. For now, the court notes that defendants collectively filed a Memorandum opposing SRA's motion (Doc. 22). And on April 29, 2021—just 72 hours after this conflict commenced and seemed to conclude— the court conducted a Show Cause Hearing to give the parties a chance to argue their competing views (Doc. 23). At the hearing, the court directed the parties to submit supplemental briefing addressing what relief is appropriate. *Id.* (Hr'g Tr. 78:16–18). Plaintiff and defendants timely provided their views. Docs. 26, 27.

## II.     Legal Standard

"There can be no question that courts have inherent power to enforce compliance with their lawful orders through civil contempt." *Shillitani v. United States*, 384 U.S. 364, 370 (1966) (citations omitted). Our Circuit says a "district court may exercise broad discretion in using its contempt power to assure compliance with its orders." *Rodriguez v. IBP, Inc.*, 243 F.3d 1221, 1231 (10th Cir. 2001) (citation omitted). "Sanctions for civil contempt are imposed to coerce compliance with the court's order." *United States v. Pro. Air Traffic Controllers Org., Loc. 504*, 703 F.2d 443, 445 (10th Cir. 1983). Accordingly, "civil contempt continues until terminated by compliance." *Id.* (citing *Shillitani*, 384 U.S. at 368–69).

The party seeking an order of civil contempt bears the burden to demonstrate by clear and convincing evidence that sanctions are merited. *Id.* (citation omitted). The moving party satisfies its burden by proving that "a valid court order existed, that the defendant had knowledge of the order, and that the defendant disobeyed the order." *Reliance Ins. Co. v. Mast Constr. Co.*, 159 F.3d 1311, 1315 (10th Cir. 1998) (citation omitted). One can answer the first question—whether a valid court order was in place—by referencing Fed. R. Civ. P. 65(d). That Rule "requires injunctions and restraining orders to describe the enjoined conduct in reasonable detail without merely referencing the complaint or other document, and binds nonparties in active concert or participation with parties if they 'receive actual notice of the order by personal service or otherwise.'" *Reliance Ins. Co.*, 159 F.3d at 1315–16 (quoting Fed. R. Civ. P. 65(d)).

Where the moving party satisfies its burden through clear and convincing evidence, the burden shifts to the nonmoving party "to show either that he complied with the order or that he could not comply with it." *United States v. Ford*, 514 F.3d 1047, 1051 (10th Cir. 2008) (citing *United States v. Rylander*, 460 U.S. 752, 757 (1983)). "The Supreme Court has long held that '[t]he absence of willfulness does not relieve [one] from civil contempt. . . . Since the purpose is remedial, it matters not with what intent the defendant did the prohibited act.'" *Universal Motor Oils Co., Inc. v. Amoco Oil Co.*, 743 F. Supp. 1484, 1487 (D. Kan. 1990) (quoting *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 191 (1949)).

Drawing on its wide discretion in this realm, the court may choose from a number of tools to advance the remedial purpose served by civil contempt sanctions. For instance, the court may order the parties held in contempt to pay attorneys' fees. *Id.* at 1487 (citation omitted). The court also can order payment of related fees and expenses incurred during litigation. *Premium Nutritional Prods., Inc. v. Ducote*, 571 F. Supp. 2d 1216, 1220 (D. Kan. 2008). Likewise, the

court may order a party held in contempt to pay back any profits it earned as a result of its conduct giving rise to the conflict. *Id.* at 1221. And the court can order a party to pay a daily fine based on the duration of its noncompliance. *Id.* And while the dispute at hand wouldn't warrant it, a court, at common law, even could incarcerate the noncompliant party to coerce cooperation. *Int'l Union, United Mine Workers of Am. v. Bagwell*, 512 U.S. 821, 840–41 (1994) (Scalia, J., concurring) (citing *Gompers v. Buck's Stove & Range Co.*, 221 U.S. 418, 441–44 (1911)).

**III.    Analysis**

*First*, "a valid court order existed" within the meaning of Fed. R. Civ. P. 65(b). *See Reliance Ins. Co.*, 159 F.3d at 1315; *see also* Fed. R. Civ. P. 65(b). No one suggests a contrary conclusion, nor could they. The court entered the Order requested by all parties. *Second*, there's no uncertainty "that the defendant[s] had knowledge of the order[.]" The sun set but one time between defendants signing off on the Stipulated Preliminary Injunction and plaintiff's Motion for Contempt—*i.e.*, the current motion (Doc. 19). *Id.*; *see also* Docs. 14, 15. *Third*, "the defendant[s] disobeyed the order." *Reliance Ins. Co.*, 159 F.3d at 1315.

The key facts go something like this, and they all occurred within the same 24 hour period: (1) defendants signed off on the Stipulated Preliminary Injunction; (2) defendant Holt exchanged emails with a "Restricted Client" (Westpro); and (3) Mr. Holt exchanged emails with a second Restricted Client (PKC Construction).[2] Doc. 20 at 1–2. On April 27, 2021, one of SRA's clients—*i.e.*, one of the clients defendants agreed not to engage—emailed defendant Holt about details that only could involve business dealings. *See* Doc. 20 at 3. But, a big problem quickly emerged. At some point during the exchange, the client apparently copied the wrong

---

[2] The Stipulated Preliminary Injunction defines the term "Restricted Client" using clear language. The court assumes all parties are familiar with it, given they proposed and signed the injunction. *See* Doc. 15 (Stipulated Prelim. Inj.).

contact to his reply. *Id.* at 4. Specifically, and rather than linking up with co-defendant Lance Luther via Mr. Luther's new email address with Virtus, the client copied Mr. Luther's *old* email address at SRA. *Id.* It seems SRA had the foresight to monitor the individual defendants' old email accounts for such a transgression because the company quickly took note of this exchange. *Id.* at 2–4. Around the same time, Mr. Holt exchanged emails with another Restricted Client, PKC. Doc. 20 at 4. The parties dispute why this happened, but no one denies that Mr. Holt forwarded the email exchange to defendant Mr. Fishbach's old email address with SRA. Here again, SRA still was monitoring these email accounts and thus learned about the communications. So, less than one day after signing the Stipulated Preliminary Injunction, at least one defendant in this matter was doing what the injunction prohibits.

      A.      **Plaintiff's Arguments**

Plaintiff asserts "Holt and Virtus have violated the provisions of the Preliminary Injunction" because that agreement required "both Virtus and each of the Former SRA Employees . . . to 'refrain from directly or indirectly offering, selling, soliciting, quoting, placing, providing, renewing, or servicing any insurance products or services to the Restricted Clients.'" Doc. 20 at 5 (quoting Doc. 15 at 1, 3 (Stipulated Prelim. Inj. ¶¶ 1(b), 2(b)). Mr. Holt "was violating the Preliminary Injunction within hours of it having been consented to by Defendants and entered by the Court." *Id.* at 6. And because he's in a senior post at Virtus—*i.e.*, a Vice President position—"his actions can be imputed directly to his employer." *Id.*

As for its burden of proof, plaintiff contends, *first*, that it's "without question that the Preliminary Injunction entered in this case is a lawful and valid order." *Id*. *Second*, the language contained in the Preliminary Injunction is "clear and unambiguous." *Id.* at 6–7. And *third*, according to plaintiff, "Defendants are able to comply with the requirements of the Preliminary

7

Injunction." *Id.* at 7.  Plaintiff argues "Holt and Virtus cannot demonstrate any reasonable attempt to comply with the Preliminary Injunction, and the evidence unmistakably shows that Holt and Virtus are, to the contrary, willfully and brazenly violating the Preliminary Injunction[.]"  *Id.*

### B.      Defendants' Arguments

Defendants respond with a few arguments of their own.

*First*, defendants draw from an alleged phone call between Virtus CEO Andrew Gray and Randy Larsen, the President of SRA's parent company.[3]  According to defendants, the two men spoke by phone on April 27, 2021, and Larsen reiterated a slew of threats made as part of a personal vendetta by Larsen to ensure "pain to Virtus and the individual defendants."  Doc. 22 at 2–3.  Even if this allegation is true, it has no bearing on the matter at hand.  Defendants worked with plaintiff to draft a binding obligation—the Stipulated Preliminary Injunction (Doc. 15).  Then, at almost the exact same time, at least one defendant violated the Order's terms.  These details are all that matter for the current motion, which seeks civil sanctions because defendants allegedly violated the Preliminary Injunction.  *See* Docs. 19, 20.

*Second*, Virtus's CEO testified at the Show Cause Hearing that Virtus has no desire for SRA's protected information.  Doc. 24 at 40 (Hr'g Tr. 40:3–7); *see also* Doc. 22 at 2 ("Despite several reassurances from Gray that Virtus did not want, and was not in possession of, any trade secrets, data, or confidential information from Plaintiff, Larsen continued to reiterate that trade secrets had been stolen.").  Here again, these details are inconsequential.  The question at hand is not whether Virtus purloined SRA's data (or even desires it).  Rather, the only question is whether defendants breached the court's Preliminary Injunction.  They did.

---

[3]      "SRA is among a family of insurance brokerages owned by Assured Partners Capital, Inc. and its related companies[.]"  Doc. 6 at 10 (Am. Compl. ¶ 36).

*Third*, defendants say, Mr. Holt's "communications with WestPro were not a violation of the preliminary injunction." Doc. 22 at 5–6. Instead, defendants argue Mr. Holt replied to WestPro's email outreach as "a matter of professional courtesy." *Id.* at 5. The court has reviewed the emails in question. Doc. 20-1 (Ex. A). The conversations clearly involved matters professional in nature. *See id.* at 4 ("Matt . . . . please let us know what we need to do to protect ourselves when we use a subcontractor."). Defendant Holt replied to offer advice and suggest a phone call for further discussion. *Id.* While defendant Holt may have replied, at least in part, as a matter of courtesy, the Stipulated Preliminary Injunction prohibited him from working with WestPro on a matter like this one. This conversation violated the Stipulated Preliminary Injunction.

*Fourth*, defendants ask the court to believe that defendant Holt *intentionally* forwarded his email communications with PKC to SRA. Doc. 22 at 6–7. This, they say, "was not a breach or even an attempt at a breach of the preliminary injunction; rather, Holt believes that Fishbach's former e-mail address is being monitored and the client e-mail would get to the appropriate contact at Plaintiff." *Id.* at 6. Defendants are right about one thing: plaintiff is still monitoring Mr. Fishbach's old email address. *See* Doc. 20-2 (Ex. B). But they're wrong about almost everything else. At the Show Cause Hearing, defendant Holt testified that "when [he] emailed the PKCC document to Mr. Fishbach's e-mail address, [he] could have sent it to *any* SRA employee[.]" Doc. 24 at 73 (Hr'g Tr. 73:7–15) (emphasis added). In other words, defendants argue Mr. Holt's conduct was the most sensible way for him to provide plaintiff with notice of the client's need. Mr. Holt asks the court to accept that he *intentionally* forwarded the PKC correspondence to an old SRA email inbox so that SRA would know about PKC's insurance needs. *See id.* at 74 (Hr'g Tr. 74:6–17); *see also* Doc. 22 at 6–7. This explanation is farfetched.

9

It asks the court to find that Mr. Holt communicated with his former employer—SRA—by sending an email he dispatched to an email account of an employee (Mr. Fishbach) who no longer worked at SRA. The evidence convinced the court that Mr. Holt knew the email addresses of many of his former colleagues at SRA. *See id.* at 74 (Hr'g Tr. 74:6–17); *see also* Doc. 22 at 6–7. A rational person motivated by the purpose Mr. Holt claims would have used an active SRA email address.

The court finds the evidence is clear and convincing, and it favors the inference that Mr. Holt meant to loop Mr. Fishbach into his efforts to violate the Stipulated Preliminary Injunction. It is far more likely than not that Mr. Holt meant to communicate to Mr. Fishbach—his colleague from their days together at SRA but now also employed by Virtus—but his electronic device had other ideas. That device likely auto-filled Mr. Fishbach's old address at SRA and that electronic assist allowed SRA to learn about Mr. Holt's activities. This inference of accidental disclosure to SRA, the court finds, is far more likely than Mr. Holt's version of events.[4]

The court pauses to note one important detail about all of these email exchanges. Defendant Holt could have mentioned to either Restricted Client that he was prohibited from discussing certain work matters with them. He didn't. Mr. Holt's communications with WestPro and PKC breached the Stipulated Preliminary Injunction. And to the extent defendants argue these communications were innocent and a matter of mere courtesy, the facts of each conversation belie their assertions. Defendant Holt gave no appearance that he desired to cooperate with the terms of the injunction. Instead, his conversations with two separate Restricted Clients give just one appearance: a desire to work with a Restricted Client.

---

[4]   Mr. Holt's explanation doesn't account for the WestPro emails, where Mr. Holt again engaged with a Restricted Client but didn't forward WestPro's messages to SRA.

10

*Last*, defendants cling to an argument about technical language in their industry. They say "servicing" a client—a term used explicitly in the Employment Agreements and Stipulated Preliminary Injunction—carries a very specific meaning. *See* Doc. 22 at 4 (asserting that "servicing" means an insurance broker "acts as an agent for the client to a third party or insurance carrier" and that "examples of servicing are making changes to insurance policies, managing claims, and speaking to an insurance carrier on behalf of a client"). "These acts require that the insurance broker have a document called a Broker of Record, sometimes called a BOR." *Id.* Neither Virtus nor defendant Holt had or have a BOR for WestPro or PKC, so—defendants argue—these communications couldn't amount to "servicing" a Restricted Client in a way that breaches the Preliminary Injunction. *Id.* at 5 (arguing that "[w]ithout a BOR, an insurance broker cannot provide any service to a client" and "Virtus does not have a BOR with PKC Construction, WestPro, or any Restricted Client").

This argument fails for several reasons. For one thing, the Stipulated Preliminary Injunction bars a broad swath of conduct, including servicing, but also much more. *See* Doc. 15 at 2 (Stipulated Prelim. Inj. ¶ 1(b)) (prohibiting the Former SRA Employees from engaging with Restricted Clients in any way involving "directly or indirectly offering, selling, soliciting, quoting, placing, providing, renewing, or servicing any insurance products or services"). So, even if the court agreed with defendants' technical definition of "servicing"—it doesn't—the court still would find these email exchanges amounted to "directly or indirectly offering . . . soliciting . . . [or] providing" a service to Restricted Clients. *Id.* Even if "servicing" carries the technical meaning defendants provide, it defies logic to believe that an insurance broker may only "service" a client or prospective client in the narrow context defendants propose. The Stipulated Preliminary Injunction speaks of both "services" and "servicing" in a sense that

11

conveys a broad prohibition against defendants providing work-related services. Here, defendant Holt provided a work-related service to Restricted Clients and defendants' argument can't save defendants from those facts.

### C.     Appropriate Relief

The discussion thus far shouldn't surprise the parties. At the Show Cause Hearing on April 29, the court advised the parties that "Mr. Holt violated the injunction that he and his employer asked the court to enter." Doc. 24 at 78 (Hr'g Tr. 78:12–15). The only remaining question was what sanction that violation should receive. Here's what each side has to say about it, and what the court concludes is an appropriate path forward for now.

#### 1.   Plaintiff's Arguments About Appropriate Relief

Plaintiff's supplemental briefing on this issue asks the court to impose four different forms of relief. *See generally* Doc. 26. Below, the court addresses each of them in turn.

##### a.   Expedited Discovery

Plaintiff doubts sharply that defendants' known breaches of the Preliminary Injunction constitute the full extent of their misdeeds. Doc. 26 at 5–6. "Defendants are in sole possession of the evidence showing the extent and substance of their communications with Restricted Clients." *Id.* at 6. "To address this concern, SRA proposes a set of narrowly tailored expedited discovery requests separately directed to Holt and Virtus . . . seeking information directly related to preserving and uncovering violations of the Preliminary Injunction." *Id.* Attached to its brief, plaintiff includes its proposed interrogatories and production requests for defendants. Docs. 26-2, 26-3 (Exs. 2–3).

### b. Communication to Certain Restricted Clients

That's not all. "SRA requests that the Court include in its sanctions Order" a requirement "that Defendants issue a communication to any Restricted Client with whom they have been in contact since April 16, 2021 or with whom they have contact in the future." Doc. 26 at 7. Plaintiff goes on to provide a proposed message for defendants to send to the relevant Restricted Clients. *Id.* at 7–8.

### c. Attorneys' Fees and Costs Incurred During the Contempt Proceedings

Plaintiff asserts it "incurred significant expense in connection with these contempt proceedings, which SRA had to file the day after Defendants *agreed* to the Preliminary Injunction." *Id.* at 9. Given that plaintiff faults defendants entirely for this conflict ever even existing, it also argues that "SRA is entitled to attorneys' fees and costs incurred in connection with these Contempt proceedings." *Id.* (first citing *John Zink Co. v. Zink*, 241 F.3d 1256, 1262 (10th Cir. 2001); then citing *JP Morgan Sec. LLC v. Anderson*, No. 16-CV-584-GKF-FHM, 2017 WL 1073361, at *3 (N.D. Okla. Mar. 21, 2017)). Last, SRA says it will "submit evidence of its fees and costs to this Court for entry of a specific amount after the conclusion of these contempt proceedings." *Id.*

### d. Retrospective and Prospective Coercive Fines

Last, plaintiff argues the court to "impose a fine of $1,000 per violation of the Preliminary Injunction" for the two violations described above, both of which occurred between the time the parties executed their agreed Preliminary Injunction and the Show Cause Hearing. *Id.* at 10. On top of that, plaintiff requests *prospective* fines—in the amount of $2,500 for future violations of the Preliminary Injunction—because it's "necessary to impress upon Defendants the seriousness of this Court's orders." *Id.*

13

### 2. Defendants' Arguments About Appropriate Relief

Defendants claim they've "attempted to work with Plaintiff from the very beginning of this dispute," but the court wonders how the two known breaches of the Preliminary Injunction fold into that mix. Doc. 27 at 2. Below, the court nonetheless reviews defendants' assertions in their supplemental brief about appropriate relief.

#### a. Civil Contempt Sanctions are Unnecessary Because Defendants are Already Complying with the Preliminary Injunction

"Defendants respectfully suggest that no sanctions are warranted because they are not necessary to obtain compliance with the Court's Order[.]" Doc. 27 at 1. For support, defendants spotlight *Fish v. Kobach*, 294 F. Supp. 3d 1154, 1168–69 (D. Kan. 2018), where Judge Robinson refused to order sanctions because—by that time—the party held in contempt already was complying with the court's order. *Id.* at 1–2 (citing *Fish*, 294 F. Supp. 3d at 1169). Of course, in *Fish*, Judge Robinson *did* order an award of attorneys' fees. *Id.* (citing *Fish*, 294 F. Supp. 3d at 1169). But, say defendants, it only was because of "the lengthy period of time, nearly two years, in which defendant was not in compliance with the Court's Order." *Id.* at 2 (citing *Fish*, 294 F. Supp. 3d at 1169).

Here, defendants argue, they've tried their best to comply. *Id.* at 2–3. And but-for plaintiff's reluctance to help defendants comply, perhaps they could've already resolved this matter. *Id.* Plus, they say, "both Mr. Gray and Mr. Holt personally heard this Court's admonition at the hearing on April 29[,]" so apparently there "is simply no need to enter sanctions to enforce compliance." *Id.* at 3.

### b. Civil Contempt Fines are Inappropriate Because Plaintiff Hasn't Sustained a Loss

Defendants also note that "any compensatory fine must have a basis in the actual loss the plaintiff sustained; otherwise, a sum is speculative." *Id.* at 4 (citing *Universal Motor Oils Co.*, 743 F. Supp. at 1487). "Here, because SRA sustained no loss and Virtus gained nothing, a compensatory fine is inappropriate." *Id.* On top of that, "Holt and Gray both stated that they have no intention to seek out these clients at a later date, so there is no need to speculate as to future losses to SRA." *Id.*

### c. Expedited Discovery Isn't Merited Because Standard Discovery Will Commence Soon

Last, defendants mention briefly their opposition to plaintiff's proposal for expedited discovery tailored narrowly to the issue of their breaching the Preliminary Injunction. *Id.* at 5. "[A]s indicated by the Court at the end of the hearing on April 30, the Magistrate Judge will promptly hold a scheduling conference and discovery will begin soon." *Id.* "Thus, defendants respectfully ask that this Court not enter an Order for expedited discovery." *Id.*

### 3. The Court's Conclusions, For Now

Below, the court explains its current conclusions. To the extent the court denies plaintiff its requested relief, it does so without prejudice to refiling after expedited discovery concludes. But for now, the court concludes that defendants Virtus and Matthew Holt acted with contempt for the Stipulated Preliminary Injunction. The court thus holds these two defendants in contempt.

### a. Expedited Discovery is Merited and Magistrate Judge O'Hara Should Handle It

The court agrees with plaintiff. It scarcely had time to breathe before discovering defendants' breach of the agreement. Plaintiff appears to envision expedited discovery that's

15

"narrowly tailored" and the court also agrees that this approach is appropriate. *See, e.g.*, Doc. 26 at 2. Specifically, the court orders:

> Expedited discovery in this case shall be limited exclusively to efforts designed to discern the nature and scope of any breaches that may have occurred of the Preliminary Injunction (Doc. 15). Plaintiff may conduct limited discovery using the means and inquiries authorized by Magistrate Judge O'Hara. **This ruling does not exclude or limit Judge O'Hara from authorizing additional discovery, either as permissible on the merits or as necessitated by other requests for immediate or interim relief.**

The court directs counsel for plaintiff to contact Judge O'Hara to: (a) inform him of the court's decision in this Order to permit limited immediate discovery about the scope of defendants' violation of the Stipulated Preliminary Injunction; and (b) request a prompt discovery conference to allow the court to manage this limited discovery.

### b. Defendant Matthew Holt Must Send Correspondence to Restricted Clients WestPro and PKC About this Court's Order

Again, the court agrees mostly with plaintiff. Its request that defendants send written correspondence about the Preliminary Injunction is reasonable, particularly in light of the facts established so far. However, the court's agreement comes with a caveat. First, defendant Matthew Holt must send this correspondence to WestPro and PKC—the only two companies known for certain to have engaged with defendants in a capacity that's in breach of the Preliminary Injunction. Second, the court has revised plaintiff's proposed communication and provides its revision, below. Mr. Holt—no later than the close of business (5:00pm, CDT) on Tuesday, May 11, 2021—must send the following correspondence by email to relevant contacts at WestPro and PKC:

> Dear _____,
>
> Thank you for your outreach. Pursuant to a prior Employment Agreement with my former employer, SRA Insurance Agency, LLC (SRA), and a federal court order, I am unable to offer, sell, solicit, quote, place, provide, renew, or

16

> service any of your insurance needs, or otherwise communicate with you about any insurance-related matters. If you are still working in a client capacity with SRA, you can contact them directly to discuss any needs that you may have.  For your convenience, I have copied to this email Clint Kuechler and Matt Benge with Assured Partners Capital, Inc., SRA's parent company.  Clint is available by phone at (913) 236-3072 or via email at Clint.Kuechler@assuredpartners.com. Matt's phone number is (913) 236-3069 and his email address is Matt.Benge@assuredpartners.com.  Of course, you may also reach out directly to any of your familiar contacts at SRA. However, I am unable to assist you on any work-related matters.

If the parties discover other violations of the Preliminary Injunction, Virtus must arrange for the appropriate individual defendant to send this communication voluntarily, or if not voluntarily, on motion by plaintiff and court order.  The court reminds defendants that it didn't invent the restrictions imposed by the Preliminary Injunction.  Defendants helped draft them, and then they signed off on the Preliminary Injunction.  Doc. 15 (Stipulated Prelim. Inj.).  Neither plaintiff nor this court caused defendants' breach of that Order.  Defendants managed that on their own.  They likewise can manage the effort to mitigate any effects of their violations.

### c. Attorneys' Fees, Related Costs, and Coercive Fines Are Premature, but Plaintiff May Refile for this Relief After Expedited Discovery Concludes

In different and individually labelled sections of its supplemental brief, plaintiff elaborates on its request for attorneys' fees and related costs, plus coercive fines.  Here, the court addresses these requests altogether because each is premature for the same reasons.  To cut to the chase, plaintiff's request is denied, for now.  At the conclusion of expedited discovery, plaintiff may refile a motion for sanctions, including attorneys' fees and other litigation costs, plus coercive fines.

Plaintiff wants attorneys' fees, but it recognizes that any amounts it could recover can't yet be determined.  Doc. 26 at 9 (explaining SRA's proposal to "submit evidence of its fees and costs to this Court for entry of a specific amount after the conclusion of these contempt

17

proceedings"). Plus, plaintiff doesn't identify *who* it wishes to foot the bill. SRA's briefing hones in on Mr. Holt and Virtus, but its arguments don't specify which of the two (or both) should pay its attorneys. But most of all, plaintiff's request simply arrives too soon. More is to be said and done in this case, per plaintiff's request for expedited discovery. It makes the most sense for plaintiff to file its motion for attorneys' fees at a later time, when the picture of this legal landscape has clarified itself.

Similarly, plaintiff's request for coercive fines is premature. If, at the conclusion of expedited discovery, plaintiff has proof of other breaches that caused it loss, the company will have a stronger and better-timed case for the relief which they claim. At present, all that's known is that defendant Matthew Holt communicated with WestPro and PKC about insurance services and thus violated the Preliminary Injunction. Rather than decide what's appropriate just for those breaches, the court defers consideration of coercive fines until expedited discovery concludes. At that time, plaintiff may refile a motion for this relief.

## IV.    Conclusion

This mess was made by at least one of the defendants. Contrary to defense counsel's argument at the Show Cause Hearing, none of the conduct at issue is akin to a casual conversation at a cocktail party. Doc. 24 at 35 (Hr'g. Tr. 35:1–11). Instead, it reflects a disregard for binding legal obligations that *defendants* asked the court to impose.

**IT IS THEREFORE ORDERED BY THE COURT THAT** plaintiff's Emergency Motion for Contempt, Order Setting Show Cause Hearing, and Order Permitting Expedited Discovery Related to Show Cause Hearing (Doc. 19) is **granted in part and denied in part**.

**IT IS FURTHER ORDERED THAT** defendants Matthew Holt and Virtus LLC are held in contempt for their violation of the court's Stipulated Preliminary Injunction (Doc. 15).

**IT IS FURTHER ORDERED THAT** plaintiff is directed to contact the Chambers of Magistrate Judge James P. O'Hara to coordinate expedited discovery consistent with the parameters defined by the court in this Order.

**IT IS FURTHER ORDERED THAT** defendant Matthew Holt must send email correspondence to appropriate contacts at WestPro and PKC, as described in this Order and within the timeframe established in this Order.

**IT IS FURTHER ORDERED THAT** plaintiff's request for fees and coercive fines is denied but without prejudice to refiling after expedited discovery concludes in this matter.

**IT IS SO ORDERED.**

**Dated this 7th day of May, 2021, at Kansas City, Kansas.**

s/ Daniel D. Crabtree
**Daniel D. Crabtree**
**United States District Judge**
